**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JERVIS B. WEBB COMPANY,

    Plaintiff,

v.

                                       CASE NO. 07-10571
                                       HON. LAWRENCE P. ZATKOFF
                                       MAG. VIRGINIA M. MORGAN

THE KENNEDY GROUP, a/k/a
KENNEDY AUTOMATION LIMITED,

    Defendant,

and

THE KENNEDY GROUP, a/k/a
KENNEDY AUTOMATION LIMITED,

    Counter-Plaintiff,

v.

JERVIS B. WEBB COMPANY and SAFECO
INSURANCE COMPANY OF AMERICA,

    Counter-Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on May 9, 2008

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter comes before the Court on Plaintiff/Counter-Defendants' Motion for Summary Judgment of Counterclaims [dkt 47]. The parties have fully briefed the Motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the

decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. LR 7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted. For the reasons set forth below, Plaintiff/Counter-Defendants' Motion for Summary Judgment of Counterclaims is DENIED.

## II. BACKGROUND

The Motion before the Court pertains only to the counterclaims alleged by Defendant/Counter-Plaintiff Kennedy Group ("Kennedy") against Plaintiff/Counter-Defendant Jervis B. Webb Company ("Webb"). In 1999, Jacksonville Airport Authority entered into a contract with Centex Rooney Construction Company for a terminal expansion project at the Jacksonville International Airport in Jacksonville, Florida. Centex Rooney operated as the general contractor for the project. Webb submitted a proposal to Centex Rooney to supply equipment and material for the baggage handling system. After Centex Rooney gave Webb permission to proceed with drawings and submittals, Webb solicited quotations. On March 9, 2006, Kennedy submitted a proposal to Webb in which it outlined the scope of the work, pricing, labor rates, terms and conditions, and stated that all prices were firm for 30 days. Centex Rooney ultimately entered into a contract with Webb on May 1, 2006, pursuant to which Webb agreed to furnish the labor and materials required in the installation of the baggage handling system for an amount exceeding $10 million.

On May 10, 2006, Webb sent Kennedy a written direction to proceed with a small amount of the proposed work limited to $50,000 in expenditures. According to Kennedy, Webb verbally instructed Kennedy to continue work after exhausting the $50,000 limitation. On June 1, 2006, Kennedy submitted an invoice to Webb in the amount of $250,444.23 in accordance with the procedures outlined in Kennedy's March 9, 2006, proposal. At this point, no contract existed

between the parties. Webb never paid the June 1 invoice. Attached to the invoice was a letter to Tom Miciek, the Director of Corporate Procurement and Supply for Webb, in which Kennedy advised Webb of price increases in copper wiring since the initial proposal was submitted. The letter also raised concerns regarding the delay in beginning the project and the impact the delay would have on the work schedule, especially as it pertained to overtime compensation.

On June 9, 2006, Webb met with Kennedy's President, Dave Maxwell, as well as Miciek, and David Klann, who was Webb's Senior Project Manager. Allegedly, this meeting involved discussions of price increases and overtime costs that would be incurred because of the compressed schedule resulting from the delayed start. At this meeting, Webb presented Kennedy with a Purchase Agreement. Rather than re-writing the Agreement to reflect copper price increases and required overtime compensation, Kennedy maintains that "Mr. Miciek and Mr. Klann requested Kennedy to submit the increases as a change order and Kennedy agreed to do so." The parties signed the Agreement as it was written, thereby confirming that Webb subcontracted the installation portion of the baggage system to Kennedy. Under the terms of the Purchase Agreement, Kennedy would complete the installation for a fixed price of approximately $2.8 million. On July 14, 2006, Webb obtained Payment and Labor and Material Bonds from Counter-Defendant Safeco Insurance Company, as surety in favor of Centex Rooney in the amount of Webb's contract.

The Webb-Kennedy Purchase Agreement incorporates various other documents by reference, including Webb's Purchase Order Terms and Conditions and Webb's General Terms and Conditions for Subcontracts. The Purchase Agreement prioritizes those two documents in that order—Webb's Purchase Agreement controls. Under the Agreement's terms, Webb is obligated to pay overtime if such overtime is pre-approved in writing. Further, Kennedy must provide daily time sheets to Webb

3

in order for Webb to pay for Kennedy's work.

Webb's Purchase Order Terms and Conditions "contain the complete and exclusive agreement between Buyer [Webb] and Seller [Kennedy]." Any modification or revision to the Agreement shall be valid only if "agreed to in a subsequent writing signed by an authorized representative of Buyer [Webb]." The Purchase Order Terms and Conditions further allow Webb to impose various limitations on Kennedy, including the right of Webb to "setoff amounts owed to Kennedy by the amount of any counterclaim it has arising under the Subcontract." The Purchase Order Terms and Conditions also specify that Webb is not liable to Kennedy for incidental or consequential damages. Finally, the Purchase Order Terms and Conditions mandate that all changes to the Agreement be in writing and approved by Webb. Any failure by Kennedy to provide Webb with notice of a change to the Agreement bars any claim that Kennedy might have for equitable adjustment to the contract's price or time terms.

Webb's General Terms and Conditions for Subcontracts also require changes, including time and compensation, to be in writing and approved by Webb. Pursuant to the General Terms, Kennedy may increase the contract price if any change causes an increase in the cost of its work provided that Kennedy presents a written request to Webb within ten days of receiving notice of such a change. This same approach applies to situations in which Kennedy intends to make a claim for extra compensation or damages. Failure to provide notice within the requisite ten-day period results in waiver of the claim. The General Terms also dictate that "[Webb] will not make any payments to [Kennedy], including progress and final payments, unless and until [Webb] has been paid by Owner or General Contractor for [Kennedy]'s work." Finally, the General Terms explain that Kennedy's failure to pay its subcontractors amounts to a breach of the Agreement.

4

Kennedy employed an on-site project manager, Neil Ouellette,[1] and an on-site project liaison officer, Christine Maxwell, who ensured that the project was properly documented. Webb had a superintendent, Wade Quillen, on site as well as David Klann. These individuals figured prominently in the daily operations and interactions between the parties. Quillen was given copies of each daily time sheet, endorsed by either Ouellette or Maxwell, as well as overtime sheets that Ouellette signed to verify that the work was performed. When design problems arose, Kennedy prepared a master list of "contract change notices," which was updated regularly to reflect requests for additions to the contract for changes made in the field at Webb's direction. According to Kennedy, a copy of each updated document was presented to Klann who consequently possessed a "running total of the change orders."

Beginning in June, when the parties were officially operating under a contract, Kennedy maintains that it submitted monthly invoices through October 20, 2006, at which point it was discovered that Webb was supplying the wrong electric motors for the conveyor system. The non-conforming motors led to a dispute between Webb and Centex who stopped payments to Webb. Kennedy's invoices were presented to Klann who signed several of them. Kennedy corresponded with Klann in writing on September 15, 26, 29; October 5 and 6; and November 20 and 28, asking Webb to issue change orders and pay the outstanding invoices. It is not clear from the parties what subsequently happened to these invoices or whether Klann was even authorized to approve them. It appears that Klann approved ten of the 20 invoices submitted, including at least one of which that contained a charge for $79,000 in overtime pay. According to Kennedy, only five of the invoices

---

[1] Neil Ouellette's name is spelled in at least three different ways in the parties' papers. In the interest of consistency, the Court uses this spelling.

were paid. Kennedy alleges that it learned through discovery that some of its requests for extras were denied; these denials, however, were never conveyed to Kennedy. According to Kennedy, Klann "sat on everything and procrastinated on everything. He kept on saying 'trust me' . . . ."

Kennedy had subcontracted its work to a mechanical installer, White Electrical Construction Company, and an electrical installer, Milton J. Wood Company, both of which required Kennedy to make payments within 25 days of receiving weekly invoices. Kennedy's contracts with White and Wood were also unlimited with respect to time and materials despite the fact that Kennedy's arrangement with Webb was fixed at $2.8 million. When Webb stopped payments to Kennedy, Kennedy borrowed approximately $900,000 to pay White and Wood for their work and keep them on the job. Even so, Kennedy allegedly owes White and Wood a total in excess of $3.5 million. According to Webb, this disproportionate debt stems in large part from Kennedy's approval of "virtually every expense White and Wood submitted." Webb ultimately terminated its relationship with Kennedy after White and Wood threatened to demobilize on the project due to Kennedy's nonpayment of invoices. Webb brought suit, alleging breach of contract. Kennedy counterclaimed against Webb alleging the same and seeking payment on Webb's bond obtained from Safeco. Kennedy has consented to judgment in favor of White and Wood.

### III. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should

6

be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Although all inferences must be drawn in favor of the nonmoving party, this Court bears no obligation to imagine favorable facts where the nonmoving party has alleged none. The moving party must also set forth facts sufficient to establish its case: "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Webb argues that the parol-evidence rule bars Kennedy from arguing that Webb orally agreed to increase the contract amount to account for increases in copper-wire pricing and for the compression of the work schedule. Webb further argues that Kennedy failed to comply with the Agreement's claim and notice provisions thereby barring its claims for extra costs or time. Next, Webb maintains that the Agreement's pay-when-paid provision prevents Kennedy's breach-of-contract counterclaim for lack of payment. Webb further maintains that Kennedy waived its right to consequential damages and that Counter-Defendant Safeco is entitled to summary judgment to the same extent as Webb.

Kennedy maintains that there are no issues pertaining to parol evidence, merger clauses, or oral promises because the unpaid invoices were properly submitted. Kennedy seeks payment for what it is owed under the contract, alleging that Webb breached the contract first thereby rendering it impossible for Kennedy to pay its subcontractors. Kennedy argues that overtime costs and related "extras" were the sole responsibility of Webb and not items that would be charged to the owner;

7

consequently, these items were not subject to the pay-when-paid clause. Kennedy further argues that the parol-evidence rule has no application because Webb's officers stated that Kennedy should submit a change order for price increases and these statements are admissible as party admissions. Kennedy denies that it was not complying with contractual provisions pertaining to daily time sheets and prior approvals.

The parties dispute many of the underlying events giving rise to the present suit. For example, Kennedy alleges compliance with the contractual procedures governing submissions of daily time sheets and notices of overtime while Webb contends the opposite. Also, a curious dynamic surrounds Klann. He admittedly signed off on several invoices that were never paid. After examining the materials submitted, the Court cannot discern what authority Klann possessed in the Webb chain of command. Although Klann was a Senior Project Manager, his signature carried seemingly no weight. In fact, email correspondence between Webb's Senior Vice President and Chief Operating Officer and Webb's Managing Director indicates great displeasure with Klann:

> From this moment forward until we train all the [Project Managers] on the expectations of how they are to manage their contracts all [Project Managers] as well as all [Project Manager] personnel need to know that all communication on financial issues go through only us three. Also we need an emergency plan to replace David Klann on Jacksonville immediately. For me to again be blindsided by finance on an issue on a job is not acceptable, another $230k claim from Kenedy [sic]? We need to discuss what the heck is going on!

The Managing Director's responsive email suggests that Klann's signature of approval meant little or nothing:

> Understood. This $230,000 is not and has not been a secret. It is part of the overall Kennedy claim of $721,000 that was originally rejected. This $230,000 was for Kennedy schedule compression that was originally rejected due to insufficient back-up. David says he gave this number because he was asked for worst case potential

8

claims. We will not account for this $230,000 in the EAC.

The rejection discussed in this correspondence was allegedly never communicated to Kennedy. In addition to the disputes of events that occurred under the Agreement, the parties began a working relationship without the benefit of a signed contract. Rising out of that pre-contract work is an invoice from Kennedy that was never paid by Webb.

Notwithstanding the factual uncertainties, which render summary judgment inappropriate in their own regard, the pay-when-paid clause further clouds the issue. The parties note that Michigan enforces such clauses. *See, e.g.*, *Christman Co. v. Anthony S. Brown Dev. Co.*, 533 N.W.2d 838 (Mich. Ct. App. 1995). While Michigan has enforced such clauses, the trend of the courts "is to hold that unless the contract shows clearly that such an action is an express condition, the provision with reference to such act is inserted in order to fix the time of performance, but not to make the doing of such act or the happening of such event a condition precedent." *Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*, 303 F.2d 655, 660 (6th Cir. 1962); *see also* 8 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 19.58, at 492–93 (4th ed. 1998) ("[C]ourts will typically construe . . . 'pay when paid' clauses strictly; unless the parties clearly intend that the subcontractor is to bear the risk of the owner's nonpayment, the contractor will bear it, and the subcontractor will be entitled to payment when the contractor gets paid or after a reasonable time").

In *Christman*, cited by Webb, the relevant contract provision expressly stated that it operated as a condition precedent: "the receipt of such payments by the Christman Company being a condition precedent to payments to the subcontractor." *Christman Co.*, 533 N.W.2d at 839. The subsequent section of the *Christman* contract articulated final payment terms with similar emphasis on its operation as a condition precedent. Here, the contract provision provides that "[Webb] will

9

not make any payments to [Kennedy], including progress and final payments, unless and until [Webb] has been paid by Owner or General Contractor for [Kennedy]'s work." Although use of the word "unless" suggests a conditional relationship, the dispute between the parties indicates that the clause does not unequivocally evince the parties' intent that the terms of payment operate as a condition precedent to payment. When examining the nature of the pay-when-paid clause, the Sixth Circuit has opined that "[t]o construe it as requiring the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, which may never occur, is to give to it an unreasonable construction which the parties did not intend." *Thos. J. Dyer Co.*, 303 F.2d at 661.

The Court finds that pay-when-paid clauses warrant caution and, in the realm of summary judgment, diligent scrutiny. Without disregarding the long-accepted principal that parties have the right to contract in whatever ways they deem to be appropriate, the Court here is presented with parties that dispute the relevance and understanding of a critical term in their contract. Viewing this matter in the light most favorable to Kennedy, especially considering the contractual and factual disputes, the Court finds that summary judgment is inappropriate.

## V. CONCLUSION

For the above reasons, Plaintiff/Counter-Defendants' Motion for Summary Judgment of Counterclaims is DENIED.

IT IS SO ORDERED.

                                                s/Lawrence P. Zatkoff
                                                LAWRENCE P. ZATKOFF
                                                UNITED STATES DISTRICT JUDGE

Dated: May 9, 2008

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on May 9, 2008.

                                                s/Marie E. Verlinde
                                                Case Manager
                                                (810) 984-3290